J. P. MANNING, PLAINTIFF IN ERROR, V. CHARLES W. FINN, DEFENDANT IN ERROR.

**Malicious Prosecution:** EVIDENCE. In an action for malicious prosecution, where it does not appear, by a preponderance of the evidence, that the defendant, before commencing the criminal prosecution on which the action is brought, truly, fully, fairly, and in good faith stated to counsel all of the facts of the case known to him, or which with reasonable diligence he could ascertain or discover, and was afterwards advised by such counsel to institute such criminal prosecution, and that the defendant instituted the same in good faith and without malice, believing the plaintiff to be guilty of the offense charged, a judgment for the plaintiff will not be reversed on the ground that the verdict is not sustained by the evidence.

ERROR to the district court for Douglas county. Tried below before NEVILLE, J.

*George S. Smith, O'Brien & O'Brien,* and *C. A. Baldwin,* for plaintiff in error, cited: *Jones v. Jones,* 11 Pac. R., 817. *Moore v. R. R.,* 33 N. W. R., 334. *Walker v. Camp,* 27 Id., 800.

*John C. Cowin,* for defendant in error.

COBB, J.

This cause was brought to this court on a petition in error and bill of exceptions to the judgment of the district· court of Douglas county, on the verdict of· a jury, December 29, 1886.

The plaintiff below commenced his action August 20, 1885, to recover for his arrest and malicious prosecution in the police court of Omaha, and before the grand jury of the district court, on the charge of embezzlement and larceny, as bailee, preferred by the defendant below, on oath and indictment therefor, in February, 1883, which was continued from term to term and ended by *nolle prose-qui* in the district court, July 30, 1885, by order of the court, at the request of the district attorney.

To the allegations of the plaintiff the defendant answered, July 10, 1886, admitting that he had charged the plaintiff with the commission of crime, on which he was arrested, imprisoned, and prosecuted, but not maliciously or falsely, nor without probable cause; that he testified against the plaintiff before the grand jury, which returned a true bill at the February term, 1883; that he consulted various counsel of good standing as to the charge he was about to make, and, after laying before them all the facts known to him, was advised to make the charge and enter upon the prosecution, but denied that he prosecuted otherwise than as an impartial witness for the state.    To this issue a jury was called, December 7, 1886.

From the voluminous bill of exceptions and record, it appears that the plaintiff below, on September 26, 1881, entered upon an agency, employment, or partnership with defendant and one C. H. Watson, at Omaha, to go into Missouri to purchase for the huckster trade, apples, butter, eggs, chickens, and the like, to be forwarded to the Omaha market; that the plaintiff received money at various times from the defendant to purchase said articles, and was to

receive one-third of the profits as his interest, and was to render an account when called upon. From the memorandum book of defendant's accounts the following receipts are taken, as the only evidence of the nature of the agency and agreement between the parties:

"Septr. 10, 1881. An agreement between J. P. Maning and C. H. Watson that they are to put some money into the huckster trade. Watson puts in, say $50, and Manning, say $80; said money to be used in said business exclusively, and no part to be drawn out except by consent. There is to be a strict account kept and rendered of all truck bought and sold, at any time when called for, or at least once a week. Said Watson is to go to Missouri and make purchases, and said Manning to remain in Omaha; and said Watson shall be entitled to a one-third of all the profits that may be derived from the same; and in case of any dissatisfaction, in case the business does not pay, then said contract may be stopped and settlement made at *pro rata* after, say seven days' notice in writing; this signed this 10th day of September, 1881.

"J. P. MANNING,
"C. H. WATSON.

"OMAHA, Septr. 26, 1881. Received of J. P. Manning $100 to be used in the huckster trade, say chickens, eggs, butter, and apples, or such things as may seem best, to keep a perfect and correct account of all moneys received or paid out. The parties to this agreement are Manning, Watson, and Finn, agent, to be equally interested in profits.

"C. W. FINN.

"OMAHA, Oct. 3, 1881. Received of J. P. Manning $300, more or less, to be used in the securing of a lot of apples in Missouri by one C. H. Watson for one P. J. Manning & Co., before was J. P. Manning & Co., C. H. W., C. Finn being one of the interested parties, being en-

titled to one-third interest in the profits in the business; said money is not to be used in any way only as agreed upon, nor any part thereof in any other business except apples and eggs; and said Finn is to keep a strict and honest account of everything done, paid, and received, and what for, both day and date, to render to the said Manning at any reasonable time he may call for such a settlement, say two days at most.

"C. W. FINN."

On the trial to the jury, the plaintiff testified that he was acquainted with defendant in January, 1881; that he did business with him in the fall of that year, buying and selling eggs, apples, chickens, and butter; that the business was closed in the winter, and that there was "a partially settling up" in the spring following; that within two or three months after the settlement he was arrested on complaint of defendant, for embezzlement and larceny, by a police officer; was held to bail in $1,000, and committed to jail, and on examination in the police court was held to bail in $300, to answer the complaint at the next term of the district court; that subsequently, in February, 1883, he was indicted by the grand jury, was arraigned, plead not guilty, and was let to bail in $1,000; that the indictment against him was continued from term to term until July 30, 1885, when it was dismissed on the motion of the district attorney.

The plaintiff testified:

Q. Did you, on the 25th of February, 1882, or at any other time, in the county of Douglas, or in any other place, embezzle any property belonging to Mr. Manning, or to Manning and Watson as partners?

A. No, I did not.

Q. Or any money?

A. No, sir.

Q. Or convert any to your own use that belonged to Mr. Manning?

A. No, sir.

Q. Or Manning and Watson, as pártners?

A. No, sir.

Q. Or otherwise?

A. No, sir.

Q. Did you, as agent of J. P. Manning, in February, 1882, or at any other time, convert money intrusted to you to your own use?

A. No, sir, I never was agent for J. P. Manning.

Q. Did you ever convert money to your own use that belonged to Mr. Manning?

A. No, sir.

Q. Did you ever embezzle any of his money or property whatever?

A. No, sir.

The plaintiff also testified that he went into business, as a partner, with Manning and Watson, in September, 1881; that he made three or four trips from Omaha into Missouri, buying apples, butter, eggs, chickens, etc., forwarding the same, by railroad cars, in his own name, or that of Mr. Manning, and disposing of the articles, partly through jobbers, and huckstering the balance himself, on the Omaha market; that a portion of the apples and butter rotted and deteriorated on hand before disposed of.

That various sums of the proceeds were paid on account to the defendant without settlement, until February, 1882, a full statement of receipts and expenditures was delivered to defendant, which was termed a partial settlement, showing a deficit and loss of $866.20.

It is admitted that $100, receipted for September 26, 1881, taken by plaintiff on his first trip to Missouri to investigate the purchases of the partner, Watson, was returned, ($89) less expenses ($11), on the plaintiff's return from the trip, and is dropped out of the controversy.

The plaintiff testifies that he received of defendant, on account of the transaction, $300, October 3, 1881, for

which he signed the before-mentioned receipt, and subsequently, on the second purchasing trip, $160, October 12, and subsequently, by express, in Missouri, $300, October 24, being a total of $760, and no more at any time; that the expenditures of the third purchasing trip came to something over $600; that he had with him $300 of his own money, and that the defendant did not give him a dollar on that occasion; that out of the total sales he may have used for himself a hundred dollars, but not as much as he used out of his own pocket in the business. As to payments to defendant of the proceeds, the plaintiff testified that he gave him $200, Maroney's check $20, $200, and cash $20 again, and an order to the commission merchant, Tibbets, for the proceeds of apples, $229, and that it was his habit, as fast as he got money from sales, to turn it over to defendant; he paid $50 for rent, storage, and labor, and employed his own horse and wagon in huckstering.

He further testified:

Q. Did Mr. Manning know that you were using some of this money for yourself?

A. I could not say.

Q. Did he know that you had money in there over and above what he has furnished?

A. I could not say as to that.

Q. Did he at the last, when you made this account?

A. Yes, sir.

Q. When did this difficulty first come up between you in this business?

A. After the stuff was all disposed of.

Q. State how this matter came up between you and Mr. Manning?

A. Mr. Manning wanted me to give him a statement of what I had done. I then had a man [of Haberman's] help me make out the statement.

Q. How long after he first requested it?

A. Four or five days.

Q. Then what next?

A. He asked me for an order for those apples there [at Tibbets] and I gave him that.

Q. What else?

A. Then he wanted his money that he had put into the business. I told him that there was a heavy loss, and that he had the money from time to time, all there was left of it.

Q. He wanted his money all back?

A. Yes, his whole, entire money, all that he had put into it.

Q. What did you say to him in regard to this?

A. I told him then that there was a heavy loss, and that it could not be replaced.

Q. What did he say?

A. He said that I had got to replace it; if I did not, he would have me arrested. I told him to go ahead.

Q. When did he first threaten to have you arrested, if you did not have it replaced?

A. Right away after I gave the order.

Q. What next took place?'

A. He had me arrested.

The defendant testified on the trial that he employed the plaintiff the last of August or first of September, 1881, in business, the nature of which are two receipts in writing dated Sept. 26 and Oct. 3, 1881, and made exhibits to his testimony; that he advanced $100, on the receipt of Sept. 26, to go to Missouri and investigate the purchases of C. H. Watson, which the plaintiff did, and returned $89, having expended $11 on the trip; that the plaintiff subsequently made three additional trips, purchasing apples, eggs, butter, and poultry, on the first of which, Oct. 3, he was advanced $300, on the second, Oct. 12, $160, and by express to him in Missouri, Oct. 24, $300.50, on the third, Nov. 7, $300, and subsequently, Nov. 19, $50—total, $1110.50.

Prior to this employment he held an indebtedness of the plaintiffs of $100, which was an inducement to employ him in order to collect it in this business. The purchases in Missouri and the sales in Omaha were left in charge of the plaintiff, under an agreement and consideration of one-third of the profits, which sales were finally closed in January, 1882, with a reported loss of about $850 of the investment.

The defendant testified as follows:

Q. Did you ever have any settlement with Mr. Finn?

A. No, sir, we never had any settlement at all, he came and pretended that he wanted to settle, and denied having the goods.

Q. Failing to get a settlement with Mr. Finn, did you take counsel in the matter, and, if so, who did you speak to or consult?

A. E. F. Smythe and Mr. Stull, General O'Brien, and I had a talk with a man named Bennett, and I had a talk with Mr. Burnham.

Q. State the substance of what you said?

A. I stated that I furnished Mr. Finn this money as my agent to do this work with, that the stipulation was that he was to have a per cent, one-third of the profits after the expenses were paid. I stated that I employed him as an agent; that he had received the goods and failed to report to me, or give me any account whatever of the proceeds, or what he had done with them.

Q. State whether you showed that memorandum book to any or all of the attorneys?

A. I did, and these papers that are there [referring to a bundle of papers]; these blue papers were shown to Mr. Burnham, Col. Smythe, and Mr. Stull.

Q. State what Mr. Smythe advised you as to the proper course to pursue, and what he said as to the probable cause, if any, as to Mr. Finn's being guilty of any crime?

A. He advised me to go to the district attorney; he said I had a good cause and there was no doubt of his guilt of embezzlement, or a breach of something about bailee.

Q. State what conversation you had with Mr. Burnham in this matter?

A. I stated to Mr. Burnham that I had Finn employed, and furnished him so much money for agent; he had disposed of this property and refused to settle or account for it; that I employed him as my agent to do these things, and I was deficient; I showed him the account book that I had and the date of everything; I showed him receipts and agreement made between Mr. Finn and myself; I showed all the papers that I had, and the books and took them all to him.

Q. State what Mr. Burnham said to you?

A. Mr. Burnham said it was a good case, and he would attend to it.

Q. When did you next see Mr. Burnham?

A. I saw him the next Monday following.

Q. State if you ever saw that paper [referring to the original complaint] before, and who prepared it?

A. I signed that paper, and saw it, of course; it was prepared at Mr. Burnham's office by Mr. Bailliet, and read over to Mr. Burnham, and Mr. Burnham said it was right.

Q. State if you went to the police court and swore to that, and under whose directions?

A. Mr. Burnham's. Mr. Bailliet, deputy district attorney under Mr. Burnham, appeared there on behalf of the state. There was an examination and trial had there, and the case was sent up to the district court.

Q. State what interest you took, if any, in the case, from time to time up to its final disposition. State what you did and how you acted?

A. I do not know how I acted any more than to keep track of it a little to know when it was going to be ready

to come up, so I could be there when they wanted me. I might ask him from time to time when it was coming up, and that was all the interest I took in it. It was in the hands of the state and I had nothing to do with it.

On cross-examination, the defendant further testified:

Q. Don't you know that Mr. Finn gave you a statement of every item of expenditure from A to Izzard of his transactions?

A. It is my opinion that he did.

Q. And showed up everything?

A. That is my opinion.

Q. Where is that statement, have you got it?

A. I expect you have.

N. J. Burnham testified that he was district attorney from Jan. 1, 1881, to December 31, 1882; that the complaint of defendant in the police court was in the handwriting of his former partner, Samuel A. Bailliet.

Q. State whether you had anything to do with the getting up of this complaint?

A. I have no distinct recollection of drawing, or of having anything to do with the drawing of the complaint.

Q. In relation to this complaint, did you not tell him that it seemed to be a clear case, and you would turn it over to Mr. Bailliet to prepare the complaint?

A. I do not believe that I could have said that; I do not believe that I did. I left it to the grand jury, and it was very thoroughly examined.

Q. Did you not say to Mr. Manning that there was probable cause for the prosecution of this case?

A. I have no recollection of saying anything of the kind.

On cross-examination, he further stated that Mr. Bailliet was his law partner at that time [1881–2], but that he had nothing to do with the criminal business whatever; that he appeared occasionally as a matter of courtesy in the police court, but was not bound to do so.

George M. O'Brien testified that he was an attorney at law, resident of Omaha since 1866, and is acquainted with the parties to this action.

Q. State whether or not J. P. Manning consulted you and asked your advice in regard to the criminal matter of which Finn has been since charged, and what was then and there said and done?

A. In the early part of 1882 he consulted me; a short time before Finn was arrested, or probably about the time of his arrest, he brought to my office a book that I recognize here, and made a statement that he and Watson were in partnership in the truck business, buying and dealing in truck which they got south-east somewhere; that they employed Charles Finn as agent to purchase it and bring it here to be disposed of, and for that purpose he had furnished him money from time to time, amounting to over $1,000; that the money was paid out for the purchase and transportation of apples, butter, and chickens; that Finn was to continue as the agent for selling, and that for his pay for his services as such agent he was to have one-third of the profits. I asked Mr. Manning, why one-third of the profits, for my information; he said that they could not get at the days that he worked, and that was the way he was to have his pay for his services. Finn took his chances in getting his pay in that way. I examined the book, and don't remember whether I saw that account book or not, but think I did. I have no recollection of seeing these blue papers; I think I saw these two books. I cross-examined Mr. Manning upon the one, and he asked me what he should do, stating, at the same time, that he got advice from Mr. Smith. I says, "Mr. Manning, this statement of yours leaves Mr. Finn, if true, guilty of embezzlement." He says, "It is God's truth, and I want your opinion on it." I said that "my opinion is that the statement that you made to me is embezzlement, and he ought to be prosecuted." He says, "What shall I do

about it?" I told him that this matter, in my judgment, was sufficient, if true, to send Mr. Finn to the penitentiary, and that it was his duty to go and lay the matter before the district attorney; that he was the law officer of the government, and I did not think that private counsel had any business to meddle in such matters. Then he said, "Your advice would be to go to the state's attorney." I said, "Certainly." I told him it was my opinion and judgment that, on the statement that he made to me, and on the examination of these books, that Mr. Smith (?) was guilty of embezzlement, and I think I said to him something about being guilty of larceny as bailee, at the same time.

After an exhaustive parol inquiry, a critical cross-examination of the parties and their witnesses, and a judicious, impartial charge to the jury, a verdict was returned on the eighth day of the trial for the plaintiff. A motion for a new trial, for the causes and miscarriages of the defense, was subsequently argued and overruled, and judgment was entered on the verdict.

The case was brought thence to this court on error, presenting the following reasons:

*First.*—That the verdict of the jury is contrary to law.

*Second.*—That the verdict of the jury is not supported by the evidence, and is contrary to the weight of evidence.

*Third.*—The verdict of the jury is contrary to the instructions of the court.

*Fourth.*—The finding of the jury should have been for the defendant and not for the plaintiff.

*Fifth.*—For errors of law which occurred during the trial and were overruled, and the defendant excepted to the rulings of the court at the time.

The record presents the question, did the plaintiff in error prosecute the defendant, in the police court of Omaha, and the grand jury and district court, through malice and ill-will, and without probable cause for the charge of embezzlement?

The bill of exceptions contains 303 pages of testimony, to the jury pertinent and impertinent, taken or transcribed with a want of exactitude that adds to the embarrassment in resolving the disputed facts and circumstances which led up to the final issues between the parties. The discord of the testimony in chief, and the contradictions of the cross-examinations, darken, rather than lighten up, the merits of the controversy. The plaintiff below testifies readily to every favorable fact, has no recollection of important dates, is unable to produce his original memorandum of accounts, but swears to his office and capacity as partner instead of agent, and denies that the word *agent* was written or read to him, in the receipt and agreement which he signed to the defendant.

The defendant below is not sufficiently corroborated by his own witness, the former district attorney, as to having been legally advised that he had probable cause for the criminal prosecution, but the testimony of that witness tends to the want of advice and the contrary opinion. He is but partially corroborated in that important fact by his counsel on the trial, whose advice was that, "*if* his statement of all the facts and circumstances was true, the defendant was guilty of embezzlement." This advice, given carefully and subjunctively, was not conclusive, for, through its fatal "*if*," it destroyed the proposition that he was justified, on his statement, in commencing the prosecution. He was to undertake it, on that advice, only *if* his facts and the circumstances were true. For the certainty and sufficiency of the premises, he alone must be responsible—a question at last for the jury to decide.

The essential ground of recovery for malicious prosecution is, that it was carried on without probable cause, which is a mixed proposition of law and fact. Whether the circumstances to show it probable are true, is a matter of fact to be tried, but if true, that they make a probable cause is a question of law to be decided. (*1 Am. Lead. Cases, 263.*)

The subject of controversy begins and rests on the construction of the two receipts dated September 26 and October 3, 1881, for $100 and $300 respectively, signed by the defendant in error, as agent, for the purchase in Missouri, and sale in Omaha, of perishable articles of produce in the huckster's market. The defendant, by his receipts, was obliged to make summary accounting and settlement when called upon. The articles were both purchased and stored according to the defendant's advice, and were at all times under his control. On the suspicion of embezzlement, or misconduct, he could have discharged the agent and taken possession of the property.

Under such circumstances he claims to have advanced $1,110.50, at six different times from September 26th to November 19th, 1881, and without differences or cause for complaint, until January following, when the season of traffic was over, the articles had been disposed of, and, from their perishable nature, much of them at a loss, and, when the enterprise had become a failure, the defendant called for a settlement, and finding that $850 of his investment was lost, or not forthcoming, thought he had reason to charge the agent with embezzlement of the amount. But, however sincerely his conscientiousness may have been abused by self-interest or prejudice to his opinion, his conduct and testimony are too uncertain and contradictory to warrant that conclusion. The condition of their accounts cannot be stated with certainty from the testimony ; the books introduced are entitled to little credit if the entries could be read and understood, which is still doubtful. And, finally, the plaintiff, on cross-examination, admitted that the defendant delivered to him a " statement of every item of expenditure, and showed up everything of his transactions," which renders it altogether doubtful that he could have believed that this embezzlement had the elements of felony and crime. He cannot escape the imputation of negligence of attention to the very

Manning v. Finn.

transactions complained of, and want of investigation of the results and its causes, before reaching the conclusion that his loss of itself was à "reasonable cause for belief" of larceny. It is more probable from the testimony that the plaintiff's investment was lost through the joint mis- management of both parties, and the bad luck of the huckster's market, than sunk by the embezzlement charged.

Considering the first four of the plaintiff in error's assignments, they are to be disposed of together, in the view expressed, that the weight of evidence is not in his favor, on review of the essential grounds of the criminal prosecution originally instituted by him, as it fails to ap- pear from impartial testimony that there was probable cause for the prosecution for embezzlement.

Considering the fifth assignment, it does not appear to be specific in the plaintiff's petition in error, or in the brief of counsel to the court, what errors of law occurred on the trial, or which objected to on trial and overruled by the court are sufficient to reverse the judgment of the court. Objections, both serious and frivolous, during the eight days' trial, were too frequent and numerous to make it consistent to review the whole, *seriatim,* without specifi- cations of the views of counsel as to those considered pal- pable and important.

The formal assignment of errors seems to be too nearly within the category of *abstractions,* to be further consid- ered in an analysis, or to permit the reversal of the judg- ment in the case. Therefore, the judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.